[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14657
Non-Argument Calendar
_____

D.C. Docket No. 2:15-cv-00728-SPC-CM

GP,
minor child by and through her Mother, JP,

                                                  Plaintiff-Appellant,

versus

LEE COUNTY SCHOOL BOARD,

                                                  Defendant-Appellee,

LEXINGTON MIDDLE SCHOOL,

                                                  Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 5, 2018)

Before TJOFLAT, NEWSOM and HULL, Circuit Judges.

PER CURIAM:

Plaintiff GP, a minor female, by and through her mother JP, appeals from the district court's grant of summary judgment in favor of defendant Lee County School Board (the "Board"), in GP's action alleging sex discrimination in education, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). After careful review, we affirm.

## I.   BACKGROUND

In January 2017, plaintiff GP filed the operative revised second amended complaint in this action. In her Title IX claim, GP alleged that the Board discriminated against her based on sex when the Board (1) failed to respond adequately to GP's report that a male classmate was bullying her, and (2) responded more favorably when a male student complained of bullying by the same classmate.[1] On September 19, 2017, the district court granted the Board's motion for summary judgment on GP's Title IX claim, and dismissed the action.

---

[1] The complaint asserted three other claims for relief, one under federal law and two under Florida state law. GP voluntarily dismissed her other federal claim, and the district court declined to exercise supplemental jurisdiction over the state law claims. Consequently, only the Title IX claim is at issue in this appeal.

Because this is a summary judgment appeal, we present the facts in the light most favorable to GP, the non-moving party.[2]

**A.   November 22, 2013 Battery by NM**

From September to December of 2013, plaintiff GP was enrolled in the seventh grade at Lexington Middle School, which is located in Lee County, Florida. Beginning in September or October of 2013, GP began to experience bullying at the hands of NM, a male classmate. NM would push GP, pull her hair, pull books out of her hand, or shake a chair as she was standing on it to try to make her fall. This usually occurred during orchestra class, the last class of the day, which was the only class GP shared with NM. At first, GP never told anyone other than a few friends about NM's bullying.

On Friday, November 22, 2013, the bullying culminated in an incident during orchestra class. The incident began when NM approached GP, pushed her into a corner, and told her to "move." GP responded with a derogatory slur, saying, "You move, jit."[3] NM left to retrieve a spiral notebook, then returned to GP and asked her, "What did you call me?" GP replied, "You heard me." At that

---

[2] See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) ("We review de novo a district court's grant of summary judgment and draw all inferences and review all evidence in the light most favorable to the non-moving party.") (quotations and alterations omitted).

[3] "Jit" is a diminutive of "jitterbug," which, in turn, is a slang term for juvenile delinquent.

3

point, NM struck GP in the face with the notebook. The spiral part of the notebook hit GP in the eye.

Immediately after being struck by NM, GP reported the incident to the school principal, Linda Caprarotta, who is now known as Linda Berry. Principal Caprarotta told GP it was too late in the day to do anything about the incident, but said she would look into the situation "first thing Monday morning."

**B.     November 25, 2013 Meeting with School**

On Monday, November 25, 2013—the next school day after the incident—GP's parents visited the school. The family met first with the Assistant Principal, Jason Peters, and other officials. Assistant Principal Peters began to develop a plan to protect GP from NM. Peters proposed having another student accompany GP between classes. Peters also planned to examine GP's and NM's schedules to see when they crossed paths between classes. Peters said he would give GP an elevator pass so that she could avoid seeing NM in the hallway.

At some point, Principal Caprarotta joined the meeting. Caprarotta allegedly said she was there because she believed NM did not do anything wrong, and that she "want[ed] witnesses" and wanted GP "to prove these allegations." Caprarotta also allegedly suggested GP's appearance may have provoked NM into hitting her, saying to GP's parents: "But look how your daughter looks. She could provoke him at any moment. She could provoke anyone."

4

Later that same day, GP's mother reconvened with Assistant Principal Peters. Peters told GP's mother that NM had now admitted striking GP with the spiral notebook, and that several others witnesses confirmed the incident.

**C.     November 26, 2013 Meeting with School**

The next day, November 26, GP's mother met again with Assistant Principal Peters and Principal Caprarotta. Assistant Principal Peters told GP's mother that the school would not implement the full remedial plan discussed at the November 25 meeting. However, Peters said that GP would be removed from the orchestra class she shared with NM, which meant the two students would no longer have any classes together. GP would be placed instead in an art class that met across the hall from orchestra.

At the November 26 meeting, Principal Caprarotta allegedly suggested again that GP's appearance may have contributed to NM's striking her in the face, saying to GP's mother: "Look how she looks, look at her face, she's so cute. Maybe that provoked something. Maybe he had a crush on her."

**D.     November 26, 2013 Administrative Complaint and Investigation**

On that same day, November 26, 2013, plaintiff GP and GP's mother filed a formal administrative complaint with the school. The complaint charged NM with bullying GP over a period of a few months, beginning in September 2013.

The School Board conducted an investigation, led by Julie Claprood, a guidance counselor. Claprood interviewed GP and eleven other students who were present when NM struck GP with his notebook, and obtained written statements from each student. When Claprood interviewed plaintiff GP, she asked whether GP had a relationship with NM, or whether GP thought NM had a crush on her.

On December 4, 2013, the school investigation concluded that "bullying," as defined by the Board code of conduct, had not occurred. However, the investigation concluded that NM committed a battery on GP. As a result of the investigation, the school implemented the following remedial measures: (1) GP's schedule change was made permanent, so that she no longer shared orchestra class or any other class with NM; (2) NM was ordered not to contact GP anymore; and (3) consistent with the school's code of conduct, NM was suspended for two days for committing battery on GP. On December 9 and 10, 2013, NM served his two-day suspension.

NM did not speak to or touch GP after the remedial measures went into effect. However, GP continued to see NM in the hallways. Several times, NM came within 10 feet of GP, stared her down, and sometimes mouthed words that GP perceived to be "I'm going to kill you."

In mid-December 2013, GP's parents withdrew her from Lexington Middle School.

**E.     December 18, 2013 Complaint from Male Student RM**

On December 18, 2013—around the time GP withdrew from Lexington Middle School—the school received a complaint from RM, a male student, alleging that NM had threatened RM. The school investigated this incident and determined that NM verbally threatened RM on one occasion. As a result, the school suspended NM, pursuant to the school code of conduct. However, because RM did not request any further remedial measures, no further measures were taken.

Following the incident with RM, NM's parents withdrew NM from Lexington Middle School.

**F.     District Court's Summary Judgment Order**

As noted above, on September 19, 2017, the district court granted summary judgment in favor of the defendant Board on the Title IX claim.

In its order, the district court turned first to GP's claim that the Board responded less favorably to GP's complaint about bullying than it did to RM's complaint. The district court noted that GP offered "nothing but bare assertions" to support this claim. The district court also emphasized that RM was not similarly situated to plaintiff GP, as there were numerous factual differences between RM's complaint and GP's.

Next, the district court considered the Board's potential liability based on its deliberate indifference to student-on-student harassment. The district court found that (1) the Board did not have actual knowledge of NM's bullying before the November 22, 2013 incident of battery, (2) the Board was not deliberately indifferent to NM's harassment once it became aware of the conduct, and (3) NM's harassing conduct was not so severe or pervasive as to deprive GP of an educational opportunity.

GP now appeals.

### III.  DISCUSSION

We review de novo a district court's grant of summary judgment, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party. Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012). Summary judgment is appropriate "only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

Title IX provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

A private action for damages under Title IX requires a showing of discriminatory intent. Liese v. Indian River Cty. Hosp. Dist., 701 F.3d 334, 347 (11th Cir. 2012). A plaintiff may show discriminatory intent by showing that an educational institution receiving federal funds is deliberately indifferent to discrimination. Id.

The Supreme Court has recognized that a plaintiff may bring a private cause of action under Title IX based upon a school's deliberate indifference to student-on-student gender-based harassment. Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 646–47, 119 S. Ct. 1661, 1673 (1999). Such an action arises where the school "is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." Id. To establish a school board's liability under this theory, the student must show that: (1) the defendant is a Title IX recipient of federal funding; (2) an official with authority to take corrective action has actual knowledge of the harassment; (3) the defendant acts with deliberate indifference to the known acts of gender-based harassment; and (4) the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir. 2007) (quoting Davis, 526 U.S. at 633, 119 S. Ct. at 1661).

Here, it is undisputed that the Board is a Title IX recipient of federal funding and that Principal Caprarotta is an official with authority to take corrective action. Further, we assume <u>arguendo</u> that NM's harassing conduct was motivated by GP's gender. Therefore, we consider only whether (1) NM's conduct was pervasive and severe, and (2) the Board was deliberately indifferent once GP complained.

**A.     Severe and Pervasive Harassment**

As to the severe and pervasive requirement, the Supreme Court has observed that students in school settings "regularly interact in a manner that would be unacceptable among adults," and "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." <u>Davis</u>, 526 U.S. at 651–52, 119 S. Ct. at 1675. But "[d]amages are not available for simple acts of teasing and name-calling." <u>Id.</u> at 652, 119 S. Ct. at 1675. Rather, Title IX allows private damages only when the harassing behavior is "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." <u>Id.</u>, 119 S. Ct. at 1676. A single instance of one-on-one peer harassment is "unlikely" to have a "systemic" effect that denies the victim equal access to education. <u>Id.</u> at 652–53, 119 S. Ct. at 1676.

In addition, the effect of the harassment on the victim's access to education must be "real and demonstrable." <u>Hawkins v. Sarasota Cty. Sch. Bd.</u>, 322 F.3d 1279, 1289 n.13 (11th Cir. 2003). For instance, in <u>Davis</u>, the harassment was

10

considered sufficiently severe and pervasive where the plaintiff experienced a drop-off in her grades, and even wrote a suicide note, as a result of being sexually harassed over a five-month period that included "numerous acts of objectively offensive touching."  Davis, 526 U.S. at 634, 653, 119 S. Ct. at 1667, 1676.

Here, there is no indication that (1) NM's harassment of GP was severe and pervasive, or that (2) GP was deprived of an educational opportunity as a result. The majority of NM's improper conduct consisted of NM pushing GP, pulling her hair, knocking her books out of her hand, or shaking a chair as she stood on it. This type of "teasing, shoving, pushing, and gender-specific conduct" may well have been upsetting to GP, but it does not approach the level of "objectively offensive" harassment that gives rise to Title IX damages.  Davis, 526 U.S. at 651-52, 119 S. Ct. at 1675; Williams, 477 F.3d at 1293.  The fact that GP did not report the conduct also militates against concluding it was pervasive and severe.  The battery of November 22, 2013 was certainly severe, but it was a single incident and thus was unlikely to have the systemic effect of depriving GP of an educational benefit.  See Davis, 526 U.S. at 652–53, 119 S. Ct. at 1676.

GP also has not identified a "real and demonstrable" effect that NM's conduct had on GP's access to education.  See Hawkins, 322 F.3d at 1289 n.13. For example, GP does not argue that fear of NM compelled her withdrawal from the school a few weeks later.  To the contrary, immediately after the November 22,

11

2013 battery, GP was removed from the sole class she shared with NM, which is where the battery and most of NM's other harassing conduct took place. As a result, NM no longer had the opportunity to harass GP, other than through a few brief sightings in the hallway that involved neither physical nor verbal contact.[4]

Ultimately, after the battery incident, GP continued as a student at Lexington Middle School for a few more weeks, seeing NM a handful of times in that period, until her parents removed her from the school. As such, the record does not establish any "real and demonstrable" deprivation of an educational benefit that could give rise to Title IX liability. See Hawkins, 322 F.3d at 1289 n.13.

**B.    Deliberate Indifference**

Alternatively, even assuming NM's conduct was sufficiently severe and pervasive, GP has not shown the Board was deliberately indifferent. A school is deliberately indifferent to student-on-student harassment "only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648, 119 S. Ct. at 1674. A school is not deliberately indifferent if it takes remedial measures and those measures are ultimately ineffective. Sauls v. Pierce Cty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005). Likewise, a school is not deliberately indifferent if it

---

[4]We recognize that GP's administrative complaint summarily asserted that GP had "been an honor roll student all [her] life and now [her] grades [had] dropped," but GP's brief on appeal does not argue about her grades or cite specific evidence to support that allegation.

declines to adopt the victim's preferred remedial measures. Davis, 526 U.S. at 648–49, 119 S. Ct. at 1673–74. Rather, to rise to the level of deliberate indifference, a school's response to harassment must amount to "an official decision . . . not to remedy the violation." Doe v. School Bd. of Broward Cty., 604 F.3d 1248, 1259 (11th Cir. 2010). In Davis, for example, the school board was deliberately indifferent when it took no disciplinary action against an alleged harasser even after months of complaints, and did not allow the victim to move her classroom seat away from her harasser until more than three months had passed. Davis, 526 U.S. at 635, 119 S. Ct. at 1667.

Here, the Board learned that NM was harassing plaintiff GP on November 22, 2013, when GP reported to Principal Caprarotta that NM struck her with a spiral notebook. The next school day, Principal Caprarotta, Assistant Principal Peters, and other officials met with GP and her parents to discuss the incident. The day after that, GP was removed from the only class she shared with NM, and the school initiated an investigation into the incident. A week later, when the investigation concluded, the school made GP's schedule change permanent, ordered NM not to contact GP anymore, and suspended NM from school for two days.

These actions of the Board were far from "an official decision . . . not to remedy the violation." School Bd. of Broward Cty., 604 F.3d at 1259. Rather, the

Board took swift action to end NM's harassing conduct, both by protecting GP and by punishing NM. Compare Davis, 526 U.S. at 635, 119 S. Ct. at 1667. NM may have ignored the order to stay away from GP, but the Board's actions were not unreasonable for being less than totally effective. See Sauls, 399 F.3d at 1285. Likewise, although the Board did not provide GP with an escort between classes or access to the elevator, the Board was not obliged to provide every remedy that GP requested. Davis, 526 U.S. at 648, 119 S. Ct. at 1673-74. Title IX required only that the Board respond to GP's complaint in a way that was not clearly unreasonable. We cannot say that the Board failed to do so.

GP argues that Principal Caprarotta's and Counselor Claprood's comments—suggesting that GP's appearance may have provoked NM into striking her—were evidence of the Board's reluctance to take remedial measures, and thus constituted deliberate indifference. Those remarks were indeed questionable, and would not have been made if GP were a boy. But, as discussed above, the actions the Board took in response to GP's complaint were prompt and reasonable. The fact that some individuals made questionable comments along the way does not transform the Board's reasonable response into deliberate indifference.[5]

---

[5]Although she has largely abandoned the argument on appeal, GP argued in the district court that the Board did not ask male student RM the same questions about provoking NM. To the extent GP thus asserts a disparate treatment claim under Title IX, the claim fails. As to a disparate treatment claim under Title IX, we have looked to Title VII for guidance. See, e.g., Bowers v. Bd. of Regents of Univ. Sys. of Ga., 509 F. App'x 906, 910 (11th Cir. 2013)

## III.  CONCLUSION

Based on the foregoing reasons, we conclude that GP has not shown that the district court erred in granting summary judgment in favor of the defendant Board on plaintiff GP's claim of Title IX discrimination.  We therefore affirm the judgment in favor of the Board.

**AFFIRMED.**

---

(unpublished) ("We apply Title VII case law to assess Bowers's Title IX claim."). A disparate treatment claim requires GP to show that (1) she is a member of a protected class; (2) she was subject to an adverse educational action; (3) the school treated similarly situated students who were not members of the protected class more favorably; and (4) she was qualified.  See Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006).  First, GP was not subject to an adverse educational action.  To the contrary, the Board responded to her complaint with reasonable remedial action.  Second, the Board did not treat a similarly situated male student more favorably.  When RM complained about being threatened by NM, the Board investigated and then suspended NM, just as it did when GP complained.